IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| JASON E. OTT, | |
| Plaintiff, | 8:12-CV-71 |
| vs. | |
| CAROLYN W. COLVIN, Acting Commissioner of the Social Security Administration, | MEMORANDUM AND ORDER |
| Defendant. | |

This matter is before the Court on the denial, initially and upon reconsideration, of plaintiff Jason Ott's disability insurance benefits under Titles II and XVI of the Social Security Act, 42 U.S.C. § 401 *et seq.* and § 1381 *et seq.* The Court has considered the parties' filings and the administrative record, and affirms the Commissioner's decision to deny benefits.

PROCEDURAL HISTORY

Ott filed applications for disability insurance benefits and supplemental security income in November 2007. T215-28. Ott's claims were denied initially and on reconsideration. T107-14; T120-36. Following a hearing, the administrative law judge (ALJ) found that Ott was not disabled as defined under 42 U.S.C. §§ 416(i), 423(d), or 1382(a)(3)(A), and therefore not entitled to disability benefits. T15. The ALJ determined that, although Ott suffered from several severe impairments, and could no longer perform his past relevant work, he had the residual functional capacity to perform other jobs that exist in significant numbers in the national economy. T20-30. The Appeals Council of the Social Security Administration denied Ott's request for review of the ALJ's decision. T1-4. Ott's complaint seeks review of the ALJ's decision as the final decision of the Commissioner under sentence four of 42 U.S.C. § 405(g). Filing 1.

FACTUAL BACKGROUND

At the time of the administrative hearing in 2010, Ott was 38 years old and living in La Vista, Nebraska. Ott had completed police academy training in 1997 and an associate's degree in criminal justice and applied science in

1998. T48. He had worked as a security guard between 1994 and 1999, and in 1999 went to work for the State of Nebraska as a correctional officer. T50-51. Then he was hired by the city of Corning, Iowa as a police officer. T51-52. Ott was fired from that job, apparently because a previous criminal conviction was discovered, although there was some discussion of a possible political motive for the firing. T52. From 2000 to 2004 Ott was self-employed installing ceramic tiles. T52-53.

On December 25, 2004, Ott was assaulted and suffered an epidural hematoma. T55; T390. He was in a coma for a week or two, and required rehabilitation afterwards. T55; T399; T619. Medical records indicate that by February 2005, Ott had some residual difficulty with speech, although it had much improved, and had "the expected problems with short-term memory." T391. In March 2005, Ott successfully completed a driver's rehabilitation program, including assessments of his ability to pay attention and avoid distraction. T392-93. By June 2005, he was continuing to have some difficulty with slurred speech and pain in his right ear. T390. But "[a]side from all these problems and difficulties," he did not "voice any fresh complaints." T390. His neurological examination was stable, and the examiner did not find any new neurological deficits. T390.

Ott said he did not pursue further follow-up care for his injury because he was uninsured. T55-56. He was also given anti-depressants, but he decided to stop taking them because "[t]hey weren't working" and were giving him "side effects." T56. He testified that he tried to continue working as a tiler, but said he "screwed up a couple jobs" and "didn't do very well. . . ." T56. He has not had sustained employment since, although he did successfully work in a warehouse at a two-week temporary job in 2006. T251. (It may help set the context for what follows to note, at this point, that Ott's alleged date of disability is the date of his first injury: December 25, 2004. T18.)

In 2005, Ott was psychologically evaluated by Jane Warren, Ph.D. T552. At that time, Ott said he had bid for some tiling jobs and was still hoping to return to work. T553. He said fatigue was his primary worry in maintaining full-time employment. T553. Neuropsychological testing was performed, and Warren wrote that Ott seemed to be interested in the testing, and that his "attention did not waver and [he] seemed to be able to concentrate on the task at hand." T553. Warren said Ott was well-oriented and upbeat, and appeared to be able to concentrate and follow tasks easily. T554. Warren opined that there did "not appear to be any restriction of activities of daily living, or difficulties in maintaining social functioning." T554. Warren did note some mild depressive symptoms and a history of anger management problems, but concluded Ott was able to sustain the concentration and attention needed for task completion, was able to

- 2 -

understand and remember short and simple instructions and carry them out, and was able to relate appropriately to coworkers and supervisors and adapt to changes in his environment. T554. His prognosis was "fairly positive" given the progress made since his injury. T555.

In 2007, Ott was jailed as a result of a confrontation with his stepfather and although the charges were later dropped, he was injured again by an assault while he was in jail. T61; T423. Among other things, he suffered a broken hip, which is what prompted him to apply for disability. T62; T423; T430. He was also punched in the face during that assault, and complained of some head and facial pain, but the medical records from the incident do not reflect any further brain injury. T424. His treating physician for the hip injury opined that he had an impairment rating of 5 percent for his left leg, and gave him a full release with no permanent restrictions. T551. Ott was also evaluated for physical limitations before the administrative hearing and although some were found, they are not at issue on appeal and do not require detailed explanation. T492-501.

In late 2007, shortly after his hip injury, Ott sought mental health services from Lutheran Family Services, reporting with depression. T519-523. He was evaluated by consulting psychiatrist Eugene Oliveto, M.D., whose initial impressions included a posttraumatic stress disorder and dysthymic disorder. T528-27. Oliveto noted that Ott slurred his speech and had some memory issues, but was cooperative and had "a nice personality." T529. Ott's affect and mood were stable, but he reported being impulsive under stress, and needed to work on anger management in counseling. T529. Ott saw Arlene Garcia, Ph.D., for counseling during 2008; her treatment notes, although varied, generally reflect that Ott struggled with relationship issues and was emotionally unstable and frustrated. T509-17. Treatment notes from Garcia and Bruce Myers[1] for 2009 and 2010 reflect similar observations. T581-91.

Warren evaluated Ott again in 2008. T464. Warren characterized him as "quite pleasant." T464. Ott told Warren about seeing Garcia, who he said helped him "primarily with his depression about the future." T465. He denied, among other things, any clinical depression or anxiety. T465. Ott said he slept well. T467. When asked why it was difficult to maintain full time employment, Ott said that he was "'bummed'" that he could not get back into law enforcement. T467. He also reported that his hip bothered him and that

---

[1] Myers was another therapist who saw Ott on some occasions, particularly in 2009. Myers was, like Garcia, a licensed clinical social worker and a licensed mental health practitioner, although his educational credentials are not described in the record. *See* T581.

- 3 -

he had a speech impediment from his previous brain injury; Warren noted the speech impediment during the interview. T467.

Ott again underwent neuropsychological testing; this time, Warren observed that although Ott did not give up on the tests, he also did not seem motivated to do well. T468. Warren characterized his attitude as more general disinterest than overt malingering, and found it "surprising how well he did on the testing given his general lack of interest in it." T468. His scores were, in fact, generally higher than in 2005, although his score for "working memory" was slightly lower. T468; T553-54. Warren again found no restriction of daily living or difficulties in maintaining social functioning, and again concluded Ott was able to sustain concentration and attention needed for task completion and was able to understand and remember short and simple instructions and carry them out. T470. Warren noted some history of conflict with supervisors, but found that Ott was able to adapt to changes in his environment. T470. Warren concluded that Ott's prognosis appeared to be "limited by his own lack of initiative and motivation to make change in his life rather than any significant memory or speech problem." T470.

Because Ott had not been working, he made do with help from his parents and a neighbor who took him in, and with whom he lived until just before the hearing. T57-58. He occupied himself by, among other things, playing online poker—he played for hours at a time, although the games were very low-stakes. T58-59. At the administrative hearing, Ott said he had recovered from his hip injury, but did not think he could meet the physical requirements for police work, although he wanted to. T63. He said he might be able to work as a security guard, although he would be unable to "chase after a suspect or something" if that was required of him. T64. He participated in vocational rehabilitation in 2008, but it did not result in sustained employment. T64-65.

Ott was asked directly whether he could do some kind of work, and he said it would depend on what he was required to do. T66. Ott explained that he was forgetful, and would forget what he was supposed to do from day to day. T66. He said his 2004 attempt to return to tiling had been unsuccessful because he forgot important tasks that required much of his work to be redone at his expense. T68-69. He also described everyday tasks, like writing email, that he would forget to finish after getting distracted. T73.

Ott also said that he had anger management issues. T69. He admitted that one of the reasons he was no longer living with the neighbor who had taken him in was because he had, on several occasions, become angry and damaged property. T69-70. He thought he would be unable to take directions or criticism from a supervisor at work, because he couldn't "get along" with anybody. T74. He also testified to panic attacks and anxiety, and said that he

woke up most nights for no reason. T71-72. Both Ott's mother and a friend and neighbor also described Ott's attention deficits and frustration, and depressive symptoms, although neither described Ott as getting more agitated than raising his voice. T280-86.

Ott said he had made some attempts to get back into law enforcement, such as pursuing certification in Texas and Kansas, but that his "license was revoked" so he couldn't "get back on right now." T76-77. When asked directly whether he would consider jobs other than law enforcement, Ott replied: "I mean, no, to tell you the truth I wouldn't, I wouldn't – I would probably – no, I wouldn't – I would – no, I would – no. No." T77. When asked what he would do if law enforcement didn't work out, he simply said, "I don't know." T77.

For purposes of Ott's application for benefits, Garcia wrote a letter opining on Ott's mental condition. Garcia noted a lack of consistency in Ott's intellectual and emotional behaviors, and said that Ott "has a great deal of unresolved anger and can vacillate from passivity to rage with unremarkable triggers." T593. Ott was socially isolated, and Garcia said he suffers from disruptive sleep and nightmares of the assaults he had suffered. T593. Garcia also said Ott had uncontrollable selective memory and a limited ability to focus. T593. Garcia observed "emotional incontinence" and opined that Ott was hypersensitive. T594. Garcia opined that because of his injuries, Ott was functioning below the normal range of intelligence, although he was able to manage his own finances. T594. And Garcia opined that Ott was not a viable candidate for employment, because of his unpredictable nature, anger, lack of focus, selective memory, inability to follow instructions, and difficulty with supervisors and coworkers.[2] T594.

Oliveto also completed evaluation forms, for both an organic mental disorder and an anxiety-related disorder. T532; T538. Oliveto described Ott's organic mental disorder as arising from his 2004 injury, and noted his speech impairment. T532. Oliveto circled items on the form for memory impairment, perceptual or thinking disturbances, personality change, mood disturbance, explosive temper outbursts, and lost intellectual ability. T532. Oliveto also circled items for marked restriction of activities of daily living, marked difficulties in maintaining social functioning, deficiencies of concentration, and repeated episodes of deterioration or decompensation in work or work-

---

[2] The Court notes, however, that a treating provider's opinion that a claimant is "disabled" or "unable to work," does not carry any special significance, because it invades the province of the Commissioner to make the ultimate determination of disability. *Davidson v. Astrue*, 578 F.3d 838, 842 (8th Cir. 2009). Though a treating provider's opinion that the claimant cannot return to work may assist an ALJ, when combined with other medical information, in determining whether a claimant is disabled, such an opinion cannot resolve the issue. *Id.* at 844.

like settings. T532. Oliveto diagnosed a post-head trauma organic brain dysfunction syndrome and PTSD. T533.

Oliveto also checked items on the form for marked difficulties in shopping, cooking, cleaning, paying bills, and using public transportation. T534. Oliveto checked items for marked difficulty in communicating clearly and effectively and holding a job. T534-35. And Oliveto checked marked difficulties in independent functioning, concentration, persistence in tasks, ability to complete tasks in a timely manner, ability to repeat sequences of actions to achieve a goal, ability to assume increased mental demands associated with competitive work, ability to sustain tasks without an unreasonable number of breaks or rest periods, and ability to sustain tasks without undue interruptions or distractions. T535. Oliveto further checked list items suggesting that Ott had displayed inability to appropriately accept supervision, withdrawal from situations, exacerbation of signs of illness, exacerbation of symptoms of illness, deterioration from level of functioning, decompensation, poor attendance, superficial or inappropriate interaction with peers, inability to cope with schedules, poor decision-making, and inability to adapt to changing demands. T536. On the separate form for anxiety-related disorders, Oliveto circled an item for medically documented findings of motor tension and apprehensive expectation, and recurrent and intrusive recollections of a traumatic experience which are a source of marked distress.[3] T538.

In sum, Oliveto assessed Ott's ability to perform various tasks related to occupational adjustments, performance adjustments, and personal/social adjustments, as fair to poor. T547-49. Oliveto concluded that Ott could not be gainfully employed. T549.

But Dr. Thomas Englund, a clinical psychologist, testified at the administrative hearing about Ott's mental health history and Ott's hearing testimony. T78. England noted that Oliveto had only examined Ott on "a couple of occasions." T80. Based on Warren's evaluations and Ott's performance in the driver's rehabilitation testing, Englund found the objective evidence to suggest that "there really are no residual sorts of neuropsychological . . . or memory problems." T81-82. Englund questioned Oliveto's diagnosis of an organic brain syndrome, finding insufficient information to make that finding. T82. And Englund noted that Ott's anger management issues seemed to have preceded the brain trauma: Ott had been in counseling for anger management in October 2004. T82. Englund found

---

[3] As will be touched upon later, Oliveto apparently only saw Ott three times, and only one of those visits involved any kind of extensive evaluation. It appears that Oliveto based his opinions, in part if not substantially, on information from Garcia.

- 6 -

the evidence to support the likelihood of a depressive condition, and a possibility of posttraumatic stress symptoms, although it was not clear that any functional limitations had resulted from that. T85. Englund opined that Ott had mild restrictions on daily living; moderate difficulties in maintaining social functioning and difficulties in maintaining concentration, persistence, or pace; and no repeated episodes of decompensation. T87. Englund further opined that Ott would be no more than mildly impaired in understanding or remembering and carrying out simple instructions, although he might be moderately impaired with respect to complex or detailed instructions because other factors might interfere. T87-88. Englund did not think that Ott would have any problems handling routine, repetitive work, although he would be limited to brief, superficial social interaction. T88-89.

After the hearing, Oliveto submitted a letter at the request of Ott's counsel, explaining that since the hearing, he had reviewed Ott's files and Englund's testimony before the ALJ. T619. Oliveto opined that although most of the testing showed that Ott was not markedly impaired from his brain damage, "in many areas he still suffers substantially from posttraumatic stress disorder as well as a major depressive disorder that prevents him from being gainfully employed because of his inability to tolerate any work-related stress. . . ." T619. Oliveto noted that Ott had been in a coma for 7 days, which showed "significant brain injury as rated by most neurologists and neuropsychologists[,]" but Oliveto did not reassert his previous diagnosis (criticized by Englund) of an organic brain dysfunction syndrome. T619.

## SEQUENTIAL ANALYSIS AND ALJ FINDINGS

To determine whether a claimant is entitled to disability benefits, the ALJ performs a five-step sequential analysis. 20 C.F.R. § 404.1520(a)(4).

### STEP ONE

At the first step, the claimant has the burden to establish that he has not engaged in substantial gainful activity since his alleged disability onset date. § 404.1520(a)(4)(i); *Gonzales v. Barnhart*, 465 F.3d 890, 894 (8th Cir. 2006). If the claimant has engaged in substantial gainful activity, the claimant will be found not to be disabled; otherwise, the analysis proceeds to step two. § 404.1520(a)(4)(i); *Gonzales*, 465 F.3d at 894.

In this case, the ALJ found that Ott had not engaged in substantial gainful activity since his alleged disability onset date, and that finding is not disputed on appeal. T20.

STEPS TWO AND THREE

At the second step, the claimant has the burden to prove he has a "medically determinable physical or mental impairment" or combination of impairments that is "severe[,]" 20 C.F.R. § 404.1520(a)(4)(ii), in that it "significantly limits his physical or mental ability to perform basic work activities." *Gonzales*, 465 F.3d at 894; *see also*, *Kirby v. Astrue*, 500 F.3d 705, 707–08 (8th Cir. 2007). Next, "at the third step, [if] the claimant shows that his impairment meets or equals a presumptively disabling impairment listed in the regulations, the analysis stops and the claimant is automatically found disabled and is entitled to benefits." *Gonzales*, 465 F.3d at 894; § 404.1520(a)(4)(iii). Otherwise, the analysis proceeds.

For mental impairments, at steps two and three of the sequential analysis, the ALJ utilizes a two-part "special technique" to evaluate a claimant's impairments and determine, at step two, whether they are severe, and if so, at step three, whether they meet or are equivalent to a "listed mental disorder." § 404.1520a(a), (d)(1) and (2). The ALJ must first determine whether the claimant has "medically determinable mental impairment(s)." § 404.1520a(b)(1). If any such impairment exists, the ALJ must then rate the degree of "functional limitation" resulting from the impairment. § 404.1520a(b)(2). This assessment is a "complex and highly individualized process that requires [the ALJ] to consider multiple issues and all relevant evidence to obtain a longitudinal picture of [the claimant's] overall degree of functional limitation." § 404.1520a(c)(1).

Four "broad functional areas" are used to rate these limitations: "[a]ctivities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation." § 404.1520a(c)(3). These areas are also referred to as the "paragraph B criteria," which are contained in 20 C.F.R. Part 404, Subpart P, Appx. 1, § 12.00 et seq. The first three criteria are rated using a five-point scale of none, mild, moderate, marked, and extreme. § 404.1520a(c)(4). The fourth criterion, episodes of decompensation, is rated as: none, one or two, three, four or more. *Id*.

After rating the degree of functional limitation resulting from any impairments, the ALJ determines the severity of those impairments (step two). § 404.1520a(d). Generally, if the first three functional areas are rated as "none" or "mild" and the fourth area as "none," the ALJ will conclude that any impairments are not severe, unless the evidence indicates otherwise. § 404.1520a(d)(1). If any impairments are found to be severe at step two, the ALJ proceeds to step three, and compares the medical findings about the impairments and the functional limitation ratings with the criteria listed for each type of mental disorder in 20 C.F.R. Part 404, Subpart P, Appx. 1, § 12.00 et seq.

In this case, at step 2, the ALJ found that Ott had some severe impairments: the residuals of trauma to the brain with a craniotomy, the residuals of a fractured hip with internal fixation, PTSD, and a mood disorder. T20. But at step 3, the ALJ found that Ott did not have an impairment or combination of impairments that met or medically equaled a listed impairment. T22. And the ALJ found that the paragraph B criteria were not present. T22.

Specifically, the ALJ explained that after carefully considering the evidence, she found that Ott's "medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, [Ott]'s statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment." T24. The ALJ noted that despite his reportedly-poor concentration, Ott was able to play poker for several hours a day, and was able to drive a car. T24. The ALJ also noted that Ott had been able to work in a warehouse for two weeks, and that the job only ended because it was a temp job. T24. The ALJ found that Ott's self-described dissatisfaction with being criticized or instructed by a supervisor had no apparent connection to his medical conditions. T24. And noting Ott's generally proper behavior during his psychological examinations by Warren, the ALJ concluded that Ott's reported destructive behavior was a matter of choice and volition, not an inescapable result of his mood disorder. T24-25. The ALJ concluded that, given Ott's unwillingness to pursue work other than law enforcement, Ott's "motivation is an important factor in his perception regarding his capacity for work." T25.

The ALJ also discussed the expert opinion testimony extensively. The ALJ gave Oliveto's opinion very little weight for several reasons. First, the ALJ found that the forms completed by Oliveto were "completely at odds with the clinical notes" and were "ambiguous and contain[ed] erroneous information." T25. Although Oliveto wrote on the form that he saw Ott monthly, Oliveto had in fact only seen Ott three times, and the last two of those visits seemed to be perfunctory appointments for medication management. T25. The ALJ noted how Oliveto had concluded, in support of Ott's application for benefits, that

> there were many areas and domains and functions in which [Ott] was severely limited as a result of injury to his brain. . . . However, despite that extraordinary assessment, his treatment was limited to recommending that he obtain counseling and providing samples of medication for erectile dysfunction and

- 9 -

> stating that the claimant "basically needs to regain confidence in himself."

T26. In short, the ALJ found that Oliveto's opinion in support of Ott's application for benefits was unsupported by Ott's treatment records.

The ALJ also found Garcia's letter to be unhelpful. T26. Although Garcia described Ott's emotional state in some detail, the ALJ found that Garcia's descriptions were impractical and "virtually useless in determining his *functional* limits." T26 (emphasis supplied). Garcia had also said that Ott suffered from headaches, in-session disassociation, and "'vivid, violent nightmares[,]'" but the ALJ noted that those significant observations were somehow not mentioned in Garcia's clinical notes.[4] T26. Her stated observations were also inconsistent with Myers' notes of Ott's treatment in May and October 2009, who described Ott as "stable." T27; T581.

In sum, the ALJ found that Oliveto's and Garcia's opinions were not supported by other substantial evidence in the record. T27. Instead, the ALJ agreed with Englund, and gave greater weight to his opinion and the opinions expressed by Warren after she evaluated Ott in March 2005 and March 2008. T27.

### RESIDUAL FUNCTIONAL CAPACITY

Before moving to step four, the ALJ must determine the claimant's residual functional capacity (RFC), which is then used at steps four and five. 20 C.F.R. § 404.1520(a)(4). "'Residual functional capacity' is defined as 'the most [a claimant] can still do' despite the 'physical and mental limitations that affect what [the claimant] can do in a work setting' and is assessed based on all 'medically determinable impairments,' including those not found to be 'severe.'" *Gonzales*, 465 F.3d at 894 n.3 (quoting §§ 404.1545 and 416.945). To determine a claimant's RFC, the ALJ must consider the impact of all the claimant's medically determinable impairments, even those previously found to not be severe, and their related symptoms, including pain. §§ 404.1529(d)(4) and 404.1545(a)(1) and (2). The RFC assesses the claimant's ability to meet the physical, mental, sensory, and other requirements of work. § 404.1545(a)(4). The mental requirements of work include, among other things, the ability: to understand, remember, and carry out instructions; to respond appropriately to supervision, coworkers, and work pressures in a work setting; to use judgment in making work-related

---

[4] Nor, the Court notes, did Ott testify to anything resembling "vivid, violent nightmares" at the administrative hearing, despite specifically being asked whether his sleep was uninterrupted, and what it was that woke him up. T72. That omission is significant.

- 10 -

decisions; and to deal with changes in a routine work setting. §§ 404.1545(c) and 404.1569a(c); Social Security Ruling (SSR) 96-8p: Policy Interpretation Ruling Titles II and XVI: Assessing Residual Functional Capacity in Initial Claims.

The ALJ considers the claimant's statements about "the intensity, persistence, and limiting effects of [his] symptoms," and evaluates them "in relation to the objective medical evidence and other evidence." § 404.1529(c)(4). Ultimately, symptoms will be determined to diminish the claimant's capacity for basic work activities, and thus impact the claimant's RFC, "to the extent that [the claimant's] alleged functional limitations and restrictions due to symptoms . . . can reasonably be accepted as consistent with the objective medical evidence and other evidence." *Id*.; § 404.1529(d)(4). In assessing the credibility of a claimant's subjective testimony regarding his or her alleged symptoms, the ALJ must weigh a number of factors. *See, Moore v. Astrue*, 572 F.3d 520, 524 (8th Cir. 2009); § 404.1529(c)(3)(i–vii).[5] When deciding how much weight to afford the opinions of treating sources and other medical opinions regarding a claimant's impairments or symptoms, the ALJ considers a number of factors set forth in § 404.1527.

Based on the credibility findings discussed above at steps two and three, the ALJ found that Ott had the RFC to perform medium work, except that he is limited to routine and repetitive work that does not require extended concentration or attention, and to brief and superficial social interaction on the job. T23.

### STEPS FOUR AND FIVE

At step four, the claimant has the burden to prove that he lacks the RFC to perform his past relevant work. 20 C.F.R. § 404.1520(a)(4)(iv); *Gonzales*, 465 F.3d at 894. If the claimant can still do his past relevant work, he will be found to be not disabled, otherwise, the analysis proceeds to step five. At step five, the burden shifts to the Commissioner to prove, considering the claimant's RFC, age, education, and work experience, that there are other jobs in the national economy that the claimant can perform. *Gonzales*, 465 F.3d at 894; § 404.1520(a)(4)(v).

In this case, at step four, the ALJ found that Ott was unable to perform any past relevant work. T28. But the ALJ found, based on the testimony of the vocational expert (VE), that there were jobs that existed in significant

---

[5] In assessing a claimant's credibility, the ALJ should consider: (1) the claimant's daily activities; (2) the duration, intensity, and frequency of pain; (3) the precipitating and aggravating factors; (4) the dosage, effectiveness, and side effects of medication; (5) any functional restrictions; (6) the claimant's work history; and (7) the absence of objective medical evidence to support the claimant's complaints. *Moore,* 572 F.3d at 524.

numbers in the national economy that Ott could perform. T29. So, the ALJ concluded that Ott was not under a disability, and denied his claims for benefits. T30.

## STANDARD OF REVIEW

The Court reviews a denial of benefits by the Commissioner to determine whether the denial is supported by substantial evidence on the record as a whole. *Teague v. Astrue*, 638 F.3d 611, 614 (8th Cir. 2011) (citing 42 U.S.C. § 405(g)). Substantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the conclusion. *Id*. The Court must consider evidence that both supports and detracts from the ALJ's decision, and will not reverse an administrative decision simply because some evidence may support the opposite conclusion. *Perkins v. Astrue*, 648 F.3d 892, 897 (8th Cir. 2011). If, after reviewing the record, the Court finds it is possible to draw two inconsistent positions from the evidence and one of those positions represents the ALJ's findings, the Court must affirm the ALJ's decision. *Id*. The Court reviews for substance over form: an arguable deficiency in opinion-writing technique does not require the Court to set aside an administrative finding when that deficiency had no bearing on the outcome. *Buckner v. Astrue*, 646 F.3d 549, 559 (8th Cir. 2011). And the Court defers to the ALJ's determinations regarding the credibility of testimony, so long as they are supported by good reasons and substantial evidence. *Boettcher v. Astrue*, 652 F.3d 860, 863 (8th Cir. 2011).

## ANALYSIS

It is helpful, as an overview, to understand the fundamental disagreement in this case. The ALJ found some of Ott's testimony to be unreliable, and found some expert opinions to be more persuasive than others, and based her conclusion on those determinations. Ott accuses her of cherry-picking. But that is not the same as arguing that the ALJ overlooked critical evidence, or failed to develop the record. It is simply an argument that the ALJ believed the wrong witnesses. An ALJ is not above reproach in that regard, and the Court has considered Ott's arguments carefully. But given the standard of review, the Court finds that the ALJ's decision is certainly supported by the record.

### ALJ'S DETERMINATION OF OTT'S CREDIBILITY

Ott's first argument is that there is not substantial evidence in the record to support the ALJ's finding that Ott's testimony was not entirely credible. Filing 21 at 13. As discussed above, in discrediting Ott's testimony, the ALJ noted Ott's online poker, operation of a vehicle, and two-week temp

- 12 -

job as evidence that his self-reported limitations were inaccurate. Ott contends that the ALJ erred in using those facts as "evidence that he could do routine and repetitive work on a full time basis. . . ." Filing 21 at 13. Ott points out that his poker playing was low-stakes and unsuccessful, and that his short-term activities do not prove that he is capable of full-time work or able to cope with job-related stress. Filing 21 at 13-14.

But the point is this: Ott's activities were found to exceed his self-reported limitations, indicating a lesser impairment than was claimed in his testimony. Acts which are inconsistent with a claimant's assertion of disability reflect negatively upon that claimant's credibility. *Renstrom v. Astrue*, 680 F.3d 1057, 1067 (8th Cir. 2012). The ALJ may disbelieve subjective complaints if there are inconsistencies in the evidence as a whole. *Goff v. Barnhart*, 421 F.3d 785, 792 (8th Cir. 2005). And the Court defers to the ALJ's credibility findings where the ALJ expressly discredits a claimant's testimony and gives a good reason for doing so. *See id.* Questions of credibility are for the ALJ in the first instance. *Finch v. Astrue*, 547 F.3d 933, 935 (8th Cir. 2008).

Even if Ott's daily activities do not conclusively prove he can work, they effectively demonstrate that his ability exceeds his self-reported limitations, casting his testimony about those limitations into doubt. There is substantial evidence supporting the ALJ's finding in this regard. In addition, the fact that Ott was apparently able to work successfully in a warehouse for two weeks does suggest that he might be capable of longer-term employment. Ott only left that job because it was a temporary position, and it is relevant to credibility when a claimant leaves work for reasons other than his medical condition. *Goff*, 421 F.3d at 793.

Ott also takes issue with the ALJ's conclusion that Ott's professed inability to accept criticism or instruction was unconnected to his medical condition. Filing 21 at 14. Ott claims that the ALJ ignored evidence showing Ott's emotional volatility and social impairments. Filing 21 at 14. But the ALJ did not ignore that evidence: in fact, the ALJ limited Ott to brief and superficial social interaction on the job. T23. The ALJ was entitled to conclude from the evidence that Ott is *capable* of appropriate behavior when it is required of him. And, the Court notes, impairments that are controllable or amenable to treatment do not support a finding of disability. *Davidson v. Astrue*, 578 F.3d 838, 846 (8th Cir. 2009).

Ott further contends that when the ALJ found Ott's statements to indicate that he was unwilling to perform jobs other than law enforcement, the ALJ was ignoring medical evidence suggesting that Ott's medical condition had "affected his judgment about both social complexities and his own capacities." Filing 21 at 14. In other words, Ott seems to be explaining

his testimony as a *symptom* of disability, not an alternative explanation for his unemployment. That is an interesting theory, but it is not a conclusion that is compelled by the record. The ALJ's finding that Ott was unmotivated to pursue available employment is directly supported by Ott's own testimony—it can hardly be said that the ALJ's finding has no substantial support in the record.

Finally, Ott takes issue with the ALJ's reliance on Warren's opinions as a basis for discrediting Ott's testimony. Ott contends that Warren's conclusions are contradicted by medical evidence and witness testimony. Filing 21 at 15-18. The ALJ, according to Ott, was "'cherry-picking' the record." Filing 21 at 18. But Ott's argument is, in effect, that the ALJ erred by picking the wrong cherries. While there is undoubtedly evidence in the record to support Ott's argument, there is also substantial evidence in the record to support the ALJ's finding, which is all that is required. Although the ALJ's decision does not summarize every notation in the medical records, it is clear from the decision that the ALJ reviewed them thoroughly. The ALJ concluded that while Ott suffered from diagnosable medical conditions, the limitations resulting from those conditions were not sufficiently disabling. And more to the point, the ALJ found the medical evidence to suggest that Ott was not as limited by his condition as his testimony suggested. The Court finds substantial evidence in the record to support that finding.

## ANALYSIS OF OTT'S PTSD

Ott claims that the ALJ failed to account for all the effects of his PTSD when performing steps three and five of the sequential evaluation. Understanding this argument will require a slightly closer examination of 20 C.F.R. Part 404, Subpart P, Appx. 1, § 12.06. That section relates to anxiety-related disorders, and provides that

> [t]he required level of severity for these disorders is met when the requirements in both A and B are satisfied, or when the requirements in both A and C are satisfied.
>   A. Medically documented findings of at least one of the following:
>     1. Generalized persistent anxiety accompanied by three out of four of the following signs or symptoms:
>         a. Motor tension; or
>         b. Autonomic hyperactivity; or
>         c. Apprehensive expectation; or
>         d. Vigilance and scanning; or

    2. A persistent irrational fear of a specific object, activity, or situation which results in a compelling desire to avoid the dreaded object, activity, or situation; or
    3. Recurrent severe panic attacks manifested by a sudden unpredictable onset of intense apprehension, fear, terror and sense of impending doom occurring on the average of at least once a week; or
    4. Recurrent obsessions or compulsions which are a source of marked distress; or
    5. Recurrent and intrusive recollections of a traumatic experience, which are a source of marked distress;

And

  B. Resulting in at least two of the following:
    1. Marked restriction of activities of daily living; or
    2. Marked difficulties in maintaining social functioning; or
    3. Marked difficulties in maintaining concentration, persistence, or pace; or
    4. Repeated episodes of decompensation, each of extended duration.

OR

  C. Resulting in complete inability to function independently outside the area of one's home.

20 C.F.R. Part 404, Subpart P, Appx. 1, § 12.06. In this case, the ALJ found that neither the paragraph B nor the paragraph C criteria were satisfied.

    Ott directs the Court's attention to the paragraph A criteria, and asserts that "the ALJ was mistaken that a finding of PTSD requires an accompanying finding that [Ott] experiences 'anxiety.'" Filing 21 at 19. The Court is not clear about what, exactly, Ott is referring to. In fact, the ALJ did not discuss the paragraph A criteria. Nor was the ALJ required to do so. Section 12.06 requires that the criteria for paragraph A are met *and* the criteria for either paragraph B or paragraph C are met. Having concluded that the criteria for neither paragraph B nor paragraph C were met, the ALJ had no need to consider paragraph A. Nor does the Court, because the Court finds no error in the ALJ's paragraph B findings, and no one is contending that the paragraph C criterion is present.

    Beyond that, the Court finds no merit to Ott's argument that the ALJ ignored the symptoms, such as nightmares, described by Oliveto and Garcia. Filing 21 at 19-21. The ALJ did not ignore that evidence—the ALJ specifically explained that she did not find it persuasive because it was not

- 15 -

consistent with the other substantial evidence in the record. Nor did the ALJ err in doing so. But that implicates Ott's next argument.

### ALJ'S REJECTION OF TREATING SOURCE OPINIONS

Ott claims that the ALJ's rejection of Oliveto's and Garcia's opinions was unsupported. Filing 21 at 21. A treating source's opinion on the nature and severity of an impairment will be given controlling weight when "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and "not inconsistent with the other substantial evidence in [the] case record[.]" 20 C.F.R. § 404.1527(c)(2). But a treating source's opinion does not automatically control, since the record must be evaluated as a whole. *Goff*, 421 F.3d at 790. An ALJ may discount a treating source's medical statement where the limitations on the form stand alone, and are not mentioned in the records of treatment, nor supported by objective testing or reasoning. *Reed v. Barnhart*, 399 F.3d 917, 921 (8th Cir. 2005). Here, the ALJ explained in detail why she found that Oliveto's and Garcia's opinions were neither well-supported nor consistent with the medical records.

To begin with, it is questionable whether Oliveto's opinion is even entitled to the "controlling weight" that may be afforded to a "treating source." A treating source is a claimant's own physician, psychologist, or other acceptable medical source who provides or has provided the claimant with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with the claimant. 20 C.F.R. § 404.1502. A claimant has an ongoing treatment relationship with an acceptable medical source when the medical evidence establishes that the claimant sees, or has seen, the source "with a frequency consistent with accepted medical practice for the type of treatment and/or evaluation required for [the claimant's] medical condition(s)." *Id.* An acceptable medical source who has treated or evaluated the claimant "only a few times or only after long intervals (e.g., twice a year)" will be considered the claimant's treating source only "if the nature and frequency of the treatment or evaluation is typical for [the claimant's] condition(s)." *Id.*

Oliveto, however, only saw Ott three times over an extended period, and two of those visits do not appear to have been extensive. The course of Ott's treatment with Garcia and Myers suggests that the nature and frequency of Ott's treatment *by Oliveto* were not typical, and that Oliveto was therefore not a treating source. Ott argues that he saw Oliveto, Garcia, Myers, and at least one other therapist "at the same clinic," and that the providers "had access to each other's records." Filing 21 at 23. But a provider does not become a "treating provider" simply by sharing an office with

- 16 -

another provider who regularly sees a patient. *See Starr v. Barnhart*, 80 Fed. Appx. 529, 530 (8th Cir. 2003).

And in any event, an ALJ may discount or even disregard the opinion of a treating source where other medical assessments are supported by better or more thorough medical evidence, or where a treating source renders inconsistent opinions that undermine the credibility of such opinions. *Reed*, 399 F.3d at 921. As a general matter, the report of a consulting physician who examined a claimant once does not constitute substantial evidence upon the record as a whole, especially when contradicted by the evaluation of the claimant's treating source. *Cantrell v. Apfel*, 231 F.3d 1104, 1107 (8th Cir. 2000). But the consulting physician's report may prove to be more thorough or well-supported if the consulting physician conducts a more thorough evaluation—for example, by employing exhaustive testing regimens and psychological and mental tests. *See id.*

In this case, although Warren was not a "treating source" because she was a consulting examiner, her involvement with Ott's treatment was arguably more extensive than Oliveto's. She conducted neuropsychological testing that was focused on Ott's functional capacity, and unlike Oliveto she had the benefit of seeing him in 2005 and 2008, giving her a broader context to evaluate Ott's condition. It is not clear from the record that Oliveto had access to Warren's assessment before the administrative hearing. In sum, the ALJ did not err in finding Warren's opinions—and Englund's opinion, which substantially relied on Warren—to be more thorough and well-supported.

Ott also takes issue with the ALJ's observation that "[t]hroughout the [administrative] hearing, [Ott's] behavior was entirely appropriate and he was generally polite and respectful." T24. This, according to Ott, was the "'sit and squirm' test which has been repeatedly rejected by the courts." Filing 21 at 21. Ott is referring to the proposition that an ALJ is not free to reject a claimant's credibility with respect to subjective allegations of pain based solely on the claimant's failure to "sit and squirm" during the administrative hearing. *See, e.g., Muncy v. Apfel*, 247 F.3d 728, 736 (8th Cir. 2001); *Reinhart v. Sec'y of Health & Human Servs.*, 733 F.2d 571, 573 (8th Cir. 1984). But that is not what the ALJ did. The ALJ's conclusion was hardly based "*solely* upon the ALJ's observations at the hearing, which is an improper basis because it is not corroborated by any of the other evidence." *Compare Douglas v. Bowen*, 836 F.2d 392, 396 (8th Cir. 1987) (emphasis in original). The ALJ observed Ott's demeanor at the hearing, but also relied upon Ott's behavior when being examined and observed by Warren, a medical professional, in 2005 and 2008. T24. And the ALJ's assessment of Ott's credibility, as

described above, was based on several facts that the ALJ took from the record and Ott's own testimony.[6]

Finally, Ott challenges the ALJ's rejection of Garcia's summary letter, which Ott says included specific limitations on Ott's ability to work. Filing 21 at 22. Ott claims that the ALJ's rejection was in error because it was based on her finding that Garcia's observations were "'general, ambiguous, and imprecise. . . .'" Filing 21 at 22. But that was only part of the ALJ's reasoning. The ALJ explained that some of Garcia's letter was unhelpful because it described Ott's condition in therapeutic terms that did not translate easily to evaluating Ott's capacity to work. And the Court understands the ALJ's frustration: for example, the observation that "[a]lthough [Ott] wants closeness, he wants distance at the same time" does not have any obvious vocational implications. *See* T593. But more importantly, the ALJ also explained that Garcia's letter was not persuasive because it was not supported by Garcia's own clinical notes. And it is permissible for an ALJ to discount an opinion of a treating source that is inconsistent with the source's clinical treatment notes. *Davidson*, 578 F.3d at 843; *see also Hogan v. Apfel*, 239 F.3d 958, 961 (8th Cir. 2001). The Court, having reviewed the record, finds no error in the ALJ's determination.

## CONCLUSION

Ott suggests briefly, in conclusion, that the ALJ erred in the hypothetical questions that were posed to the VE. Filing 21 at 25. A hypothetical question must precisely describe a claimant's impairments so that the vocational expert may accurately assess whether jobs exist for the claimant. *Howard v. Massanari*, 255 F.3d 577, 581-82 (8th Cir. 2001). But the substance of Ott's argument is about his RFC, not the hypothetical. A hypothetical must include only those impairments and limitations that are supported by the record, which the ALJ accepts as valid, and which the ALJ finds to be credible. *Gragg v. Astrue*, 615 F.3d 932, 940 (8th Cir. 2010); *Young v. Apfel*, 221 F.3d 1065, 1069 (8th Cir. 2000). Ott's argument is really that the ALJ should have based Ott's limitations on Ott's own testimony, and the Court has already rejected the basis of that argument.

None of this is to say that Ott does not suffer from any limitations. Ott obviously has psychological conditions that require treatment and counseling, and the Court hopes that he gets the help he needs, for personal and employment reasons. But saying that someone needs help or treatment is not

---

[6] Nor is the Court entirely persuaded that an ALJ may *never* rely on personal observations, particularly where the claimant's reported limitations are objectively observable. For instance, if a claimant testified that he was completely unable to walk, an ALJ would surely be entitled to note if she observed otherwise during the hearing.

the same as saying that he is disabled within the meaning of the statutory requirements of the Social Security Act. Consequently, the Commissioner's decision to deny benefits will be affirmed.

IT IS ORDERED:

1. The Commissioner's decision is affirmed.

2. Ott's complaint is dismissed.

3. The parties shall bear their own costs.

4. A separate judgment will be entered.

Dated this 29th day of March, 2013.

BY THE COURT:

John M. Gerrard
United States District Judge